IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHILIP SIEGEL, derivatively on behalf of NEW YORK COMMUNITY BANCORP, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH M. OTTING, MILTON BERLINSKI, ALESSANDRO P. DINELLO, ALAN FRANK, MARSHALL LUX, STEVEN T. MNUCHIN, ALLEN PUWALSKI, PETER SCHOELS, and JENNIFER R. WHIP, <br><br> Defendants, <br><br> -and- <br><br> NEW YORK COMMUNITY BANCORP, INC., <br><br> Nominal Defendant. | Case No. <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Philip Siegel ("Plaintiff" or "Mr. Siegel"), by and through his undersigned counsel, derivatively on behalf of New York Community Bancorp, Inc. ("NYCB" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon personal knowledge as to himself and his own acts and upon information and belief, based upon the investigation and analysis of Plaintiff's counsel.

**SOURCES OF INFORMATION AND BELIEF AND RELATED PROCEEDINGS**

1. Counsel have relied on numerous sources for this Complaint, including publicly available information, and filings in the lawsuits brought against NYCB in this District, including a federal securities class action case, *Lemm v. Cangemi, et al,* 1:24-cv-00903-NRM-JRC (E.D.N.Y.)(the "Securities Class Action"). Counsel herein have reviewed the Securities Class Action's Amended Consolidated Class Action Complaint (the "Class CAC") filed on September

25, 2024 (*Lemm*, DKT. # 69). The Class CAC reflects, *inter alia,* allegations of internal wrongdoing from several confidential witnesses who allegedly worked for NYCB at relevant times.

2.      The Securities Class Action is brought against NYCB and four of its former top executives, Messrs. Cangemi, Pinto, DiNello and Adams.[1] It alleges open market securities fraud, and states: "As a direct result of Defendants' fraudulent misrepresentations, [NYCB] investors have lost billions of dollars and NYCB's stock price has not recovered..." Class CAC, ¶ 15. The Securities Class Action ostensibly seeks to recover this large sum as damages.

3.      Securities class actions such as *Lemm* are often followed by shareholder derivative actions, seeking to hold corporate officers and directors liable for damages the corporation may have suffered or may yet suffer. This has happened here, and several shareholder derivative actions have been filed in this District. Counsel have also reviewed these derivative cases brought on behalf of NYCB, as well as two originally state-filed shareholder derivative cases brought on behalf of NYCB, and then removed to this Court by Defendants who assert that they raise federal issues.

4.      These removed cases, *Cutler v. Cangemi, et al,* 2:24-CV-04078-NRM-JRC (E.D.N.Y.) and *Podems v. Cangemi, et al,* 2:24-cv-04226-JMA-ARL (E.D.N.Y.)("*Podems*") are currently the subject of pending or contemplated remand practice.  The remand motion in *Podems*

---

[1] Thomas R. Cangemi served as President and CEO of NYCB from December 31, 2020 until February 23, 2024; John J. Pinto served as the Company's Chief Financial Officer ("CFO") from December 31, 2020, and Senior Executive Vice President from February 5, 2021, until he ceased serving in those roles on or about April 12, 2024.; Alessandro P. DiNello served as Executive Chairman of the Board from February 6, 2024 through April 1, 2024, and then replaced Defendant Cangemi as CEO on February 29, 2024; and John T. Adams served as the Company's Senior Executive Vice President and President of Commercial Real Estate Finance for many years, until he ceased serving in that role on April 12, 2024.

is the most advanced, and has been fully briefed as of September 13, 2024 (*See Podems*, Dkt. # 45). The remand motion in *Cutler* will be fully briefed and filed as of November 25, 2024.

## NATURE OF THE ACTION

5. As recounted in the Class CAC, NYCB is a large community bank whose stock trades publicly. Plaintiff Siegel herein is a long-time stockholder. NYCB's stock drastically declined beginning in February 2024 as revelations were made as to previously unknown and widespread deterioration in its lending portfolio. Large "loan loss reserves" and goodwill impairments were announced, sending the stock price careening downward, and pushing NYCB almost to the brink of failure. It was saved only by the intervention of new, well-financed investors. The Company and its stockholders unquestionably sustained massive losses. The aforementioned derivative actions seek to recover those losses from present and former NYCB officers and directors.

6. This shareholder derivative action is different from the previous ones. It, too, is brought in the right and for the benefit of NYCB against its Board of Directors ("Board") to protect NYCB. But instead of seeking *post hoc* damages, it focuses on actions the Board could have taken to prevent damages, and actions they could still take to prevent similar corporate traumas. Thus, Plaintiff Siegel seeks a declaratory and permanent injunctive remedy for Board actions that were and are in violation of positive federal law. Specifically, NYCB and its Board are violating an important SEC regulation, SEC Rule 21F-17, designed to encourage and protect concerned employees who wish to report wrongdoing to regulators (sometimes known as "whistleblowers"). A whistleblower report, if acted upon, may prevent widespread losses and corporate traumas. Rule 21F-17 prohibits whistleblowing from being impeded:

> **17 CFR § 240.21F-17 Staff communications with individuals reporting possible securities law violations.** (a) No person may take any action to impede

3

an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement (other than agreements dealing with information covered by § 240.21F-4(b)(4)(i) and § 240.21F-4(b)(4)(ii) of this chapter related to the legal representation of a client) with respect to such communications. (b) If you are a director, officer, member, agent, or employee of an entity that has counsel, and you have initiated communication with the Commission relating to a possible securities law violation, the staff is authorized to communicate directly with you regarding the possible securities law violation without seeking the consent of the entity's counsel.[2]

7. As legendary investor and corporate executive Warren Buffett once said of whistleblowing channels: "on occasion, I have learned of important problems at our subsidiaries that I otherwise would have missed. The issues raised are usually not of a type discoverable by audit but relate instead to personnel and business practices. Berkshire would be more valuable today if I had put in a whistleblower line decades ago." The National Whistleblower Center states:

> Whistleblowers are the first line of defense against corruption, fraud, and wrongdoing and the single most effective source for information about fraud and other illegal activities. Despite the risk to their professional and personal lives, company insiders, government employees, and others with original information about illegal activity regularly come forward to report crimes that would otherwise go undetected.
>
> Oftentimes the first to discover and report instances of fraud, whistleblowers have proven themselves to be invaluable in the detection of crime and enforcement of various laws.[3]

---

[2] The rule stems from the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), enacted on July 21, 2010. Dodd-Frank amended the Securities Exchange Act of 1934 by adding Section 21F, "Whistleblower Incentives and Protection." The congressional purpose underlying these provisions was "to encourage whistleblowers to report possible violations of the securities laws by providing financial incentives, prohibiting employment-related retaliation, and providing various confidentiality guarantees." *See* Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act of 1934, SEC Release No. 34-64545, at p. 197 (Aug. 12, 2011). As further discussed herein, to be eligible for the anti-retaliation provisions of Dodd-Frank, a whistleblower must report wrongdoing to the SEC. It is not enough if the information provided is only reported and handled internally within the corporation. This was established in *Dig. Realty Tr., Inc. v. Somers,* 583 U.S. 149, 138 S. Ct. 767 (2018).

[3] National Whistleblower Center, "Why Whistleblowing Works", available at: https://www.whistleblowers.org/why-whistleblowing-works/

4

8. Some companies ostensibly encourage whistleblowing in corporate handbooks or other documents but then, when dealing directly with employees (such as in employment or severance agreements), negate such policies by advising the employees to essentially promise to "tell no one" of what they learned while employed at the company. The SEC has viewed such conduct as contrary to Rule 21F-17 and a legal violation.  NYCB is one of the companies that has engaged in such misconduct, and its Board does not seem to care. Counsel herein, representing NYCB stockholders, informed the Company of Rule 21F-17 violations repeatedly, beginning over eight months ago.  On information and belief, nothing has been done to remedy this.

9. NYCB violates Rule 21F-17, which prohibits deterring whistleblowing behavior, in several ways. For example, key employment agreements enforce strict confidentiality, which chills whistleblowing. But these are contradicted by the Company's current Employee Whistleblower Policy (which employees may not even know about), which permits whistleblowing to regulators. (A version of the Policy in place before December 2023 was less explicit about this). Such mixed messages create confusion, and do not reflect compliance with Rule 21F-17. As the SEC has said: "It may also be a violation of Rule 21F-17 if internal policies on reporting possible violations conflict with other policies, procedures or agreements."[4]

10. Second, to the extent any NYCB employee reads the Employee Whistleblower Policy, that employee will see that he or she is strongly urged to report possible improper activity through internal channels, but is *not told* that to receive a whistleblower award and to enjoy full statutory anti-retaliation protection the employee must also ensure that they or another have also promptly reported the information to the SEC. *See infra*, ¶¶ 45-46. NYCB carefully elides this

---

[4] *See* SEC.gov, "Whistleblower Protections: Frequently Asked Questions", Response to Question 3. Available at:  https://www.sec.gov/enforcement-litigation/whistleblower-program/whistleblower-protections#protections

5

agency reporting requirement, as well as a "120 day" reporting deadline which is the practical equivalent of a statute of limitations. An employee following the Employee Whistleblower Policy could easily fail to follow the Dodd-Frank procedures, and lose his or her rights, unless they have studied Rule 21F-17's related rules and regulations, and a Supreme Court ruling set down in 2018. Few employees will undertake this effort, or be capable of doing so. NYCB's written materials omit this vital information. An inference may be drawn that this is intentional.

11. As alleged in the Class CAC, "NYCB's risk management and loan review failures were no secret within the Company." (Class CAC, ¶ 11). But it seems no one blew the whistle, an action which could have prevented much or all of the later harm. It may be inferred that this was caused, at least in part, by NYCB's culture of silence, which is reflected in employment agreements that violate Rule 21F-17 and other actions designed to deter regulatory reporting.

12. NYCB's violations of Rule 21F-17 are known to its Board members, defendants herein. Counsel herein, on behalf of Mr. Siegel and on behalf of a fellow stockholder, told the Company of this. This information was first imparted over eight months ago. NYCB and its Board have been asked to take action to remedy this violation. The Board has remained silent as to any willingness to undertake remedial measures—which under relevant law is deemed a "refusal" to take action. Such a "refusal" permits a stockholder to bring a derivative action to compel legal compliance.

13. Corporate fiduciaries cannot refuse to comply with legal regulations, which are often referred in cases as "positive law." If they do so, they are said to be in breach of their state law "duty of loyalty." Where that loyalty breach involves federal laws, federal courts may step in to provide redress.

14. Here, Plaintiff Siegel seeks declaratory and injunctive relief aimed at compelling the Board's legal compliance. Without it, NYCB is at risk every day of a recurrence of the wrongdoing alleged in the Securities Class Action, or new types of wrongdoing, and large regulatory fines and penalties.

## JURISDICTION AND VENUE

**FEDERAL QUESTION JURISDICTION**

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331. In addition, the district courts of the United States have exclusive jurisdiction over claims alleging violations of the Dodd-Frank Act under 15 U.S.C. § 78aa(a), as the Dodd-Frank Act was enacted as an amendment to the Securities Exchange Act of 1934.

16. Federal question jurisdiction is present here, as it is likewise present in the shareholder derivative actions removed by NYCB and others to this District, as NYCB and other Defendants have acknowledged.

17. NYCB and several persons who are also defendants here have correctly asserted in opposing remand of the *Podems* action that:[5]

> (a) "Although these are nominally state-law causes of action, they contain one or more 'claims' that necessarily raise federal issues and thus give rise to federal-question jurisdiction. *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005)." (Remand Opp. Br., at 1);
>
> (b) "Plaintiff alleges a breach of the duty…that arises from the federal Securities Exchange Act of 1934 (the "Exchange Act"). For this reason…the Court simply cannot adjudicate Plaintiff's claims without adjudicating NYCB's compliance with federal law." (Remand Opp. Br., at 1);
>
> (c) [Plaintiff asserts legal requirements that] "derive from the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"),…They are

---

[5] *See Podems,* Dkt. No.43, Defendants' Memorandum of Law in Opposition to Motion to Remand, filed August 28, 2024 ("Remand Opp. Br.").

unquestionably federal issues at the core of Plaintiff's claims." (Remand Opp. Br. at 2);

(d) The regulations Plaintiff mentions were issued under Dodd-Frank, require interpretation, and therefore "are precisely the kinds of vital federal issues that justify 'resort to the experience, solicitude, and hope of uniformity that a federal forum offers'"... (Remand Opp. Br. at 3);

(e) An assertion that state-law based derivative suits do not belong in federal court under federal jurisdiction "defies nearly a century of federal arising-under-jurisdiction jurisprudence." *Ball ex rel. Regeneron Pharms., Inc. v. Baker,* No. 21-CV-6418-NSR, 2022 WL 17808785, at *5 (S.D.N.Y. Dec. 18, 2022). Plaintiff's claims [involve], disputed federal issues, and thus belong in federal court." (Remand Opp. Br., at 4);

(f) "The Complaint 'necessarily' raises federal questions because it 'is affirmatively 'premised' on a violation of federal law." *Jacobson*, 824 F.3d at 315 (quoting *Grable*, 545 U.S. at 314). Put another way, "it is the propriety of [NYCB's] actions, as prescribed under federal law"—…"that is at the heart of [Plaintiff's] allegations." *NASDAQ,* 770 F.3d at 1021. Adjudicating Plaintiff's claims will thus necessarily require the Court to interpret and apply federal law." (Remand Opp. Br., at 10)."; and

(g) "[T]he Second Circuit has affirmed federal jurisdiction when the 'gravamen of [a plaintiff's] state law claims' was "rooted in violations of federal law." *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 101 (2d Cir. 2001) ("[T]he gravamen of [plaintiff's] state law claims [wa]s that the NYSE and its officers conspired to violate the federal securities laws and various rules promulgated by the NYSE and failed to perform its statutory duty, created under federal law, to enforce its members' compliance with those laws."). Further examples abound. The same rationale supports the exercise of federal jurisdiction here." (Remand Opp. Br., at 17-18)."

18.  These averments as to federal subject matter jurisdiction made by NYCB and other NYCB-related defendants in *Podems* apply with equal force here. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

**DIVERSITY OF CITIZENSHIP**

19.  This Court also has jurisdiction with respect to Plaintiff's claims pursuant to 28 U.S.C. §1332, as Mr. Siegel is a citizen of Indiana, while no defendant is a citizen of Indiana, and the amount in controversy is in excess of $75,000, exclusive of fees and costs.

8

20. The actions of NYCB expose it to fines and penalties. The injury to be avoided by compelling compliance, before the SEC itself forces compliance, exceeds $75,000. It is rare for an SEC Rule 21F-17 penalty to be less than $75,000, and it is always more, unless the subject company is in extreme financial distress. For example, on September 9, 2024, seven companies were fined by the SEC for violating Rule 21F-17. Their *voluntar*y compliance lowered their civil penalties, but still these penalties were in the hundreds of thousands of dollars, and in one case almost $1.4 million (except for violators who were close to insolvency who paid little). Where there has been no voluntary compliance, civil penalties have run into the many millions of dollars. Examples include actions involving JP Morgan ($18 million in penalties); and D.E. Shaw & Co. ($10 million).

21. In addition, competent and effective whistleblower provisions can save a company like NYCB, with a market capitalization of $4.9 billion, millions or even billions of dollars in potential liabilities.[6]

**PERSONAL JURISDICTION AND VENUE**

22. This Court has personal jurisdiction over each defendant named herein because NYCB is a corporation that conducts business and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of

---

[6] *See* Ernst & Young, "How a robust whistleblowing framework can help create long-term value", available at: https://www.ey.com/en_gl/insights/forensic-integrity-services/how-a-whistleblowing-framework-can-create-long-term-value.

A Cordis & E. Lambert, "Whistleblower Laws and Corporate Fraud: Evidence from the United States," Accounting Forum, Volume 41, 2017- Issue 4, Summary (March 2017) ("Whistleblower laws deter fraud by increasing the likelihood of detection."), available at: https://www.sciencedirect.com/science/article/abs/pii/S0155998217300364

9

jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

23. Venue is proper in this Court pursuant to 29 U.S.C. §1391(b) because (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of fiduciary duties owed to the Company occurred in this District; (iv) defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (v) extensive litigation against the Company and its officers and directors has already been brought in this District.

## **THE PARTIES**

24. Plaintiff is a long-term stockholder of NYCB and has held such stock continuously for over 10 years. Plaintiff is a citizen of Indiana.

25. Nominal Defendant NYCB is a Delaware corporation with its principal offices located in Hicksville, New York. NYCB's common stock trades on the NYSE under the symbol "NYCB". The Company has announced it will change its name to Flagstar Financial, Inc. as of October 25, 2024, and its trading symbol to "FLG. As of August 7, 2024, NYCB had issued and outstanding 351,432,565 shares of common stock. NYCB is a citizen of Delaware and New York.

26. Defendant Joseph M. Otting ("Otting") is and has been since April 1, 2024, NYCB's President, Chief Executive Officer ("CEO") and a director since March 11, 2024. Upon information and belief, Otting is a citizen of Nevada.

27. Defendant Milton Berlinski ("Berlinski") has been a member of the Board since March 11, 2024. Upon information and belief, Berlinski is a citizen of New York.

28. Defendant Alessandro P. DiNello is and has been since April 1, 2024, the Chairman of the Board and its former President and CEO from February 29, 2024 through March 31, 2024, Executive Chairman from February 7, 2024 through March 31, 2024 and its Non-Executive Chairman from December 1, 2022 through February 6, 2024. Upon information and belief, DiNello is a citizen of Michigan.

29. Defendant Alan Frank ("Frank") is and has been a member of the Board since March 19, 2024. Upon information and belief, Frank is a citizen of California.

30. Defendant Marshall Lux ("Lux") is and has been a member of the Board since February 23, 2022. Upon information and belief, Lux is a citizen of New York.

31. Defendant Steven T. Mnuchin ("Mnuchin") is and has been a member of the Board since March 11, 2024. Upon information and belief, Mnuchin is a citizen of New York or California.

32. Defendant Allen Puwalski ("Puwalski") is and has been a member of the Board since March 11, 2024. Upon information and belief, Puwalski is a citizen of Connecticut.

33. Defendant Peter Schoels ("Schoels") is and was a member of the Board since December 1, 2022. Upon information and belief, Schoels is a citizen of Florida.

34. Defendant Jennifer R. Whip ("Whip") is and was a member of the Board since December 1, 2022. Upon information and belief, Whip is a citizen of Pennsylvania.

## SUBSTANTIVE ALLEGATIONS

**THE SCOPE OF RULE 21F-17**

35. Endeavoring to root out corporate fraud, Congress passed the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). Both Acts shield whistleblowers from retaliation, but they differ in important respects. Sarbanes-Oxley applies to all "employees" who report misconduct to the Securities and Exchange Commission ("SEC" or "Commission"), any other federal agency, Congress, or an internal supervisor. 18 U. S. C. §1514A(a)(1). Dodd-Frank defines a "whistleblower" as "any individual who provides . . . information relating to a violation of the securities laws *to the Commission*, in a manner established, by rule or regulation, by the Commission." 15 U. S. C. §78u-6(a)(6) (emphasis added). A whistleblower so defined is eligible for an award if original information provided to the SEC leads to a successful enforcement action. §78u-6(b)-(g). He or she is protected from retaliation under Dodd-Frank if the information provided is actually reported to the SEC.

36. To fulfill the congressional purpose of encouraging whistleblowing, the SEC enacted Rule 21F-17, which became effective on August 12, 2011. To obtain the benefits and protections of Dodd-Frank, and this Rule, the information in the employee's possession must be imparted to the SEC directly by the employee, his or her agent, or his or her employer. There is a strictly limited timeframe in which this must be done: 120 days. *See* 17 CFR § 240.21F-4(b)(4)(v)(C)(providing no benefits if "120 days have elapsed" since the information was internally reported if it did not directly reach the SEC by the end of that 120 days).

37. The scope of Rule 21F-17 is wide-ranging. According to the SEC, it applies to language contained in severance agreements, non-disclosure agreements, and confidentiality

12

agreements, as well as improperly restrictive language included in a company's internal policies, procedures, and guidance, such as codes of conduct, compliance manuals, training materials and other such documents.[7]

38. The last few years have shown an increase in SEC enforcement addressing violations of Rule 21F-17. But the SEC lacks the resources to detect every violation.

39. Corporate documents disseminated to (or signed by) employees and others must be unambiguous regarding the right to report violations to the SEC. They cannot, as here, appear to permit reporting in one document while impeding it in another. No ambiguity is permitted in gauging compliance with the Rule. The employee cannot be confused as to his or her rights; presented with "mixed messages"; or provided with partial information as to how to properly assert his or her reporting rights *so as to be eligible for whistleblower protection and awards*. Here, as described further below, NYCB has repeatedly employed confusing, misleading and ambiguous documents which are grossly incomplete in discussing the SEC reporting process under federal law. These communications, including NYCB's "Employee Whistleblower Policy", can easily lead an employee into *never* communicating with the SEC, *never* being eligible for a whistleblower award, and *never* falling under the protective anti-relation provisions Congress carefully included in Dodd-Frank.[8]

---

[7] https://www.sec.gov/enforcement-litigation/whistleblower-program/whistleblower-protections#:~:text=In%20addition%20to%20protecting%20whistleblowers,a%20possible%20securities%20law%20violation.

[8] As discussed *infra,* NYCB's Employee Whistleblower Policy was materially amended on December 12, 2023, but not in a way which sufficiently sets forth an employee's whistleblowing options, rights and obligations under Dodd-Frank and the regulations promulgated by the SEC under Section 21F. NYCB also does not advise employees in its employment agreements that they may have trade secret disclosure immunity as whistleblowers, even though such a reassurance is required by federal law. In addition, at least one high-ranking NYCB employee, the former President of the Atlantic Bank division, has asserted she was terminated after raising "red flags" concerning NYCB's financial risk. *See Papaioannou v. New York Community Bancorp., Inc*. C.A.

**NYCB H<small>AS</small> V<small>IOLATED</small> R<small>ULE</small> 21F-17 <small>AND</small> T<small>HE</small> B<small>OARD</small> H<small>AS</small> I<small>GNORED</small> T<small>HOSE</small> V<small>IOLATIONS</small>**

40. Counsel herein first detected NYCB's Rule 21F-17 violations in connection with the representation of another NYCB stockholder (the "Initial Stockholder."). The first communication to NYCB on behalf of the Initial Stockholder to reference Rule 21F-17 violations was dated February 20, 2024, *over eight months prior to the filing of this Complaint.* In that February 20, 2024 correspondence, which included a demand to inspect documents under Delaware's Section 220, the Company was informed of certain violative practices. It stated (at page 13):

> [T]he Company appears to be engaging in violations of SEC Rule 21F-17. As noted, similar violations of Exchange Act 21F-17 have cost companies considerable amounts in civil penalties. *We therefore demand on behalf of our client that the Company revise these agreements, and inform the employees accordingly, and that it revise any similar agreement it may have in place with other present or former employees.* (Emphasis added).[9]

41. On July 3, 2024, Plaintiff Siegel through written correspondence joined the Initial Stockholder's efforts (the "Siegel Demand").

42. Much like the February 20th letter, the July 3, 2024 Siegel Demand (at pp. 11-12) described the violations as follows:

> The Company's 2023 Proxy states at p. 41 that "All of our NEOs have entered into employment agreements…" This would include Thomas R. Cangemi, John J. Pinto, John T. Adams, Lee M. Smith and Rober Wann. On page 47 the 2013 Proxy further states: "The Company has entered into employment agreements with Messrs. Cangemi and Pinto that are identical in form and which have been in place without modification since 2006." In addition, "Mr. Adams has entered into an agreement with the Company providing for a three-year term that extends each year for an additional year unless either party gives timely notice of an intention not to extend the term." (Proxy at 48), and "Messrs. Smith and Davis entered into substantially similar employment agreements when the Company and Flagstar

---

No. 1:24- CV-3383-JGCL (S.D.N.Y), Complaint filed May 2, 2024, Dkt. # 1, at ¶¶ 60, 62.

[9] Language of this nature has been construed as a demand upon the Board to take action. *See e.g., Solak v. Welch,* No. 2018-0810-KSJM, 2019 Del. Ch. LEXIS 1338, at *13-16 (Del. Ch. Oct. 30, 2019).

entered into their merger agreement and the employment agreements became effective on December 1, 2022." *(Id.)*.

Exhibit 10.1 to the Company's 2023 10-K at p. 153 contains a "Form of Employment Agreement Between New York Community Bancorp Inc. [and] Robert Wann, Thomas R. Cangemi, John J. Pinto and R. Patrick Quinn." Exhibit 10.12 on that same page is an employment agreement with John T. Adams. Exhibit 10.15 is an agreement with Reginald E. Davis, and Exhibit 10.16 is an agreement with Lee M. Smith.

Exhibit 10. 1 contains the following clause in Paragraph 14:

14. CONFIDENTIAL INFORMATION. The Executive will not disclose to any other Person (as defined in Section 17.2) (except as required by applicable law or in connection with the performance of the Executive's duties and responsibilities hereunder), or use for the Executive's own benefit or gain, any confidential information of the Company or any affiliate obtained by the Executive incident to the Executive's employment with the Company or its affiliates. The term "Confidential Information" includes, without limitation, financial information, business plans, prospects and opportunities (such as lending relationships, financial product developments, or possible acquisitions or dispositions of business or facilities) which have been discussed or considered by the management of the Company or its affiliates but does not include any information which has become part of the public domain by means other than the Executive's failure to honor the obligations hereunder.

Section 17.2 provides:

17.2 DEFINITION OF "PERSON". For purposes of this Agreement, the term "PERSON" shall mean an individual, a corporation, an association, a partnership, an estate, a trust ***and any other entity or organization***. (Emphasis added).

The agreement with Mr. Adams contains a similar provision in Paragraph 12; and the same can be said for the agreements with executives Davis and Smith.

43.     The Siegel Demand outlined why these provisions violated Rule 21F-17, and cited various enforcement actions brought by the SEC.  The Siegel Demand concluded:

We therefore demand on behalf of our client that the Company revise these agreements, and inform the employees accordingly, and that it revise any similar agreement it may have in place with other present or former employees.

44.     That Rule 21F-17 violations have occurred here is demonstrated by *In re D.E. Shaw & Co., LP*, 2023 SEC LEXIS 2795 (SEC Sept. 29, 2023). This consent proceeding resulted in D.E. Shaw reforming its ways and paying a $10 million penalty. As here, D.E. Shaw placed language

in its employment agreements requiring employee confidentiality. There was no explicit "exception for voluntary communications with the Commission concerning possible securities laws violations." *Id.* at *2. In 2017, D.E. Shaw sent out a firm-wide email providing, "nothing in any DESCO policy or agreement (which included any Employment Agreement or Release) prohibited employees from communicating directly with or providing information to regulators, agencies, and commissions regarding possible violations of law or regulations without notice to DESCO." *Id.* at *3. But it did not revise its employment agreements until two years later, nor did it revise offending language in severance agreement releases until six years later. *Id*. The confidentiality clause of the employment agreements impeded "employees from engaging in whistleblowing activity upon onboarding *until DESCO revised its Employment Agreement in 2019*…" *Id*. at 10 (emphasis added). The Commission concluded (*id.* at *12):

> Restrictions on the ability of employees to share confidential corporate information regarding possible securities law violations with the Commission, such as those contained in DESCO's Employment Agreements and General Releases, undermine the purpose of Section 21F, which is to "encourage individuals to report to the Commission," and violate Rule 21F-17(a) by impeding individuals from communicating directly with the Commission staff about possible securities law violations.

45.    NYCB's employment agreements reflect the same violations.[10]

---

[10] Companies who have recently received instructions from the SEC as to how to avoid 21F-17 violations have "revised…internal agreement templates, adding language affirmatively advising employees and contractors that they are not prohibited from disclosing information to any governmental or regulatory authority, or collecting any related incentive awards. [They have also] used reasonable efforts to notify the affected employees and contractors that their agreements do not in any way limit their ability to contact the Commission staff or to obtain an award in connection with information they provide." *See e.g., In the Matter of Transunion,* SEC Release No. 100975 (SEC Sept. 9, 2024)(Order Instituting Cease-and-Desist Proceedings), 2024 SEC LEXIS 2241, at ¶12. Seven public companies adopted these same measures on that date to attain compliance.

46. NYCB's "Employee Whistleblower Policy" feigns an effort to inform employees of their SEC reporting rights but never tells them they must report to the SEC to be eligible for Dodd-Frank protections and rewards.[11] Instead, it attempts to convince them through manipulative language to keep their complaints "in house", and even tells them an SEC award may be increased if they use internal reporting systems. (Whistleblower Policy, at p. 3, Section I.E). This may be technically true, but will only be true if the employee within 120 days makes every effort to ensure that whatever he or she has internally reported has also been directly reported to the SEC. The NYCB Employee Whistleblower Policy is starkly omissive regarding this core requirement. NYCB does not want its employees to know this. It appears they would prefer that the employees miss the deadline. If they do miss the deadline, employees and contractors lose eligibility for any SEC award and for Dodd-Frank anti-retaliation protection. This misleading document itself violates Rule 21F-17.[12]

47. An employee following the Employee Whistleblower Policy could easily lose his or her rights, unless they have studied Rule 21F-17's related rules and regulations, and a Supreme Court ruling set down in 2018 requiring direct SEC reporting. NYCB is determined to confuse them. It is highly unlikely many NYCB employees are "Dodd-Frank experts."

48. NYCB and its Board have been aware of Rule 21F-17 violations for many months. Despite this, NYCB and its Board have failed to take corrective action. It is clear that no such action will be undertaken. Demand may be deemed refused under Fed. R. Civ. P. 23.1 and

---

[11] The current version of the Employee Whistleblower Policy is attached hereto as an exhibit. The previous version was just as misleading, and less explicit as to whistleblower rights.

[12] *Cf. Palan v. Inovio Pharms., Inc.,* 653 F. App'x 97 (3d Cir. 2016)(upholding action premised on employee handbook which misled plaintiff about his federal statutory rights). In addition, such communications involve complex legal matters and discuss "special facts", as to which the employer has far superior knowledge, and therefore a duty to make full and complete disclosure.

Delaware law. Such refusal is wrongful and in breach of duty because the violations are clear and easily remedied.

49. In light of NYCB's wrongful demand refusal, Plaintiff brings this action to redress the irreparable harm that NYCB will incur as a result of the Board's intransigence regarding compliance with Rule 21F-17.

## CAUSE OF ACTION

### COUNT I
### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE INDIVIDUAL DEFENDANTS

50. Plaintiff repeats and realleges all previous allegations.

51. The Individual Defendants each owed and owe the Company the fiduciary duties of care and loyalty. A failure to follow positive law is a breach of the duty of loyalty.

52. The Individual Defendants have knowingly permitted the Company to violate the Dodd-Frank Act, including Rule 21F-17. Demand has been made and wrongfully refused, as the violations are evident, as is the Board's duty to remedy them.

53. Defendants, as directors of the Company, were obligated to oversee all aspects of compliance with Dodd-Frank and Rule 21F-17 and permitted NYCB to violate positive law, and continued to do so even after demands for correction were made.

54. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has sustained, and will sustain, ongoing and irreparable harm.

55. Every corporation has the right to compel its agents and directors to comply with positive law.

56. Plaintiff has no adequate remedy at law and, on behalf of NYCB, accordingly seeks equitable relief. The balance of hardships tips in favor of the Plaintiff. A mandatory injunction would be in the public interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demands the following relief:

A. Finding and declaring that violations the Dodd-Frank Act, including Rule 21F-17 by NYCB, have occurred and are occurring;

B. Finding and declaring that Individual Defendants have breached their fiduciary duties;

C. Enjoining all Defendants from further violating the Dodd-Frank Act, including Rule 21F-17;

D. Should NYCB suffer damages, fines or penalties, entering judgment against the Individual Defendants and directing them to account to the Company for all such harms sustained by reason of the wrongs alleged herein;

E. Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants' and experts' fees; and

F. Granting such other and further relief as the Court may deem just and equitable.

Dated: New York, New York
October 21, 2024

**THE PASKOWITZ LAW FIRM P.C.**

*/s/ Laurence D. Paskowitz*
Laurence D. Paskowitz
The Contour
97-45 Queens Blvd., Ste. 1202
Rego Park, NY 11374
T: 212-685-0969
lpaskowitz@pasklaw.com

**KOMLOSSY LAW, P.A.**
Emily C. Komlossy
3440 Hollywood Blvd., Ste. 415
Hollywood, FL 33021
T: (954) 842-2021
F: (954) 416-6223
eck@komlossylaw.com
(*Pro Hac Vice* Request To Be Submitted)

**LAW OFFICES OF BETH A. KELLER, P.C.**
Beth A. Keller
118 North Bedford Road, Ste. 100
Mount Kisco, New York 10549
Telephone: (914) 752-3040
Facsimile: (914) 752-3041
Email: bkeller@keller-lawfirm.com

*Counsel for Plaintiff Philip Siegel*